Filed 7/16/21  In re G.L. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re G.L. et al., Persons Coming Under the Juvenile Court Law. | B308528 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>A.L.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. Nos. 20CCJP01900B, 20CCJP01900C, 20CCJP01900D |

APPEAL from orders of the Superior Court of Los Angeles County, Kristen Byrdsong, Judge Pro Tempore of the Juvenile Court.  Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

Father appeals orders declaring his three children dependents of the juvenile court and removing the children from his physical custody. He also challenges his reunification case plan and an order imposing a monitored visitation restriction. The evidence showed father had a history of domestic violence, including a violent incident that occurred during the current dependency proceeding. He also had a history of substance abuse, failed to show for multiple on-demand drug tests, and kept a bottle of "Rescue Detox" that he reportedly used before testing. The juvenile court found father's lack of credibility, his ongoing issues with violence, and his missed drug tests necessitated the challenged disposition orders. The evidence supports the court's findings. We affirm.

## FACTS AND PROCEDURAL HISTORY

Consistent with our standard of review, we state the facts in the light most favorable to the juvenile court's findings, resolving all evidentiary conflicts in favor of the findings, and indulging all reasonable inferences to uphold the court's orders. (*In re I.J.* (2013) 56 Cal.4th 766, 773; *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

The family consists of father, mother, and their three children: G.L. (born July 2014), I.L. (born June 2017), and E.L. (born July 2018). Mother has another daughter, S.R. (born December 2010), with a different father. S.R. lives with the family but is not a subject of father's appeal.[1]

Between 2015 and 2018, the Los Angeles County Department of Children and Family Services (the Department) received three referrals regarding the family. The referrals

---

[1] Mother is not a party to this appeal.

2

generally alleged domestic violence between mother and father, including an alleged 2018 incident when father hit and yelled at mother in front of the children. After investigations, the Department deemed the referrals inconclusive.

On February 26, 2020, the Department received a referral alleging the children were at risk of harm from continuing domestic violence between the parents. The reporting party had heard the children crying while the parents yelled profanities and threw things at each other.

A social worker spoke with mother, S.R., and G.L. at the family's home. Mother denied substance abuse and agreed to drug test. She said she often argued with father over " 'little things,' " but denied throwing things and denied physical violence. The children contradicted mother's account. S.R. had seen father strike mother on the arm, and G.L. saw father punch mother in the stomach. G.L. also said father disciplined him by "hit[ting] him hard on the butt with an open hand."

Father said he often argued with mother over " 'little things,' " but denied they argued in front of the children. He admitted he once pushed mother in G.L.'s presence, but otherwise denied physical violence. Father said he had been sober for the past 16 years and agreed to drug test.

On March 13, 2020, the Department received the parents' drug test results. Mother tested positive for methamphetamine and amphetamine. Father tested negative for all substances.

Mother admitted she had used methamphetamine for over 15 years and she currently used the drug almost every day. She claimed she left the children with the maternal grandmother when she did so. Father admitted he knew about mother's substance use, but he said he could not "control" it.

On April 1, 2020, mother consented to the children's removal from her custody. The Department placed the younger children with father, who had moved in with the paternal grandmother, and placed S.R. with the maternal grandmother.

On April 3, 2020, the Department filed a petition to declare the children dependents under section 300 of the Welfare and Institutions Code.[2] The petition alleged the children were at substantial risk of physical harm due to the parents' domestic violence and mother's substance abuse. The court detained the children from mother, granted her monitored visits, and ordered the Department to provide referrals to father for family maintenance services.

In May 2020, the Department interviewed the family again. Mother, the children, and the maternal grandmother all reported the parents engaged in domestic violence that often required police intervention. Father had pushed mother and punched her in the arm and stomach, while mother had pulled father's hair. Earlier that month, after the Department began monitoring the family, mother reported father had pushed her and bruised her arm during a confrontation at the family's former home. She said father left the home through the window and scratched his chest in the process.

Father acknowledged meeting mother at the home, but denied they had a physical altercation. However, the paternal grandmother said father told her the parents had argued with each other and mother had scratched him on the chest.

---

[2] Statutory references are to the Welfare and Institutions Code.

Mother admitted she had a long-term substance abuse problem and said father knew she used methamphetamine. She also suspected father used drugs with his friends. Father denied mother's allegation, but he failed to appear for a drug test on April 30, 2020.

The paternal grandmother reported father had a violent outburst with her, in front of the children, on May 14, 2020. She said mother had been speaking to one of the children on the phone when father took the phone from the child. When the paternal grandmother confronted father, he became upset and broke a mirror in the home. Father denied he was ever upset with the paternal grandmother and claimed the mirror broke because it was loosely attached to a door that had slammed shut.

The paternal grandmother also reported she was primarily caring for the children, as father left her home early in the morning and did not return until late at night. After she warned father he could not just leave the children in her care, she reported he had been more attentive to them. But the paternal grandmother also said she would not report father's misconduct, because she did not want to "get involved."

On June 12, 2020, the Department received a referral alleging the children were at risk of harm due to father's possible methamphetamine use, his recent abandonment of the children, and the paternal grandmother's complaint that she no longer wanted father or the children in her home.

Father said the paternal grandmother had disciplined G.L. by striking him on the hands and she demanded that he and the children leave her home. The paternal grandmother said she was " 'tired' " of having father and the children in her home because father was not caring for or providing for the children,

and he left her to do " 'everything.' " She denied hitting G.L. She also suspected father was under the influence of drugs because of his " 'erratic' " and " 'hysterical' " behavior, including " 'yelling' " at her.

While the social worker spoke with the paternal grandmother, father took the phone and repeatedly told the social worker she immediately needed to pick up the children because it was her " 'job to come and pick them up.' " He then hung up the phone. When the social worker called back, the paternal grandmother answered and reported father left the home with the children while "yelling at [them]."

After speaking with the paternal grandmother, the social worker spoke with mother. Mother did not know much about father's current situation, but she said the recent incident was not the first time the paternal grandmother had asked father and the children to leave her home. Mother also reported she had to take I.L. to the hospital a week earlier to receive treatment for a fever and regurgitation because father failed to "follow[ ] through" and take the child himself. The child was diagnosed with a urinary tract infection. Mother still believed father used methamphetamine. She said he had bragged to her in the past about knowing " 'how to work the system' " and about smuggling a "hose" into his drug tests when he had to give a urine sample.

Later that day, the Department received a phone call from the children's daycare provider. The provider said the daycare was closing soon and no one had come to pick up the children. The provider had been unable to reach father by telephone.

The family's social worker went to the daycare to retrieve the children. G.L. told the social worker the paternal grandmother had " 'kicked' " them out of her home and father

6

had told him they would be going to a " 'new house.' "  G.L. said he did not like living with the paternal grandmother because she yelled at him and hit him " 'all over [his] body.' "  The social worker also observed that I.L. had a severe diaper rash.  The social worker placed the children with the maternal grandmother for an extended weekend visit and later in a foster home.

On June 15, 2020, the paternal grandmother notified the Department again that she suspected father was using drugs.  She reported she found a bottle of a liquid called "Rescue Detox Instant Cleansing Energy" in her bathroom, and she believed father drank it before drug testing for the Department.  She also said father's appearance and demeanor changed during the day, reinforcing her suspicion about his substance use.  Father agreed to drug test on June 15 and June 16, but then failed to show.

On June 18, 2020, the Department filed an amended dependency petition.  The new counts alleged the children were at risk due to father's violent outbursts directed at the paternal grandmother, his unwillingness to provide ongoing care and supervision for the children, and father's substance abuse.

On June 22, 2020, the juvenile court detained the children from father's custody and granted him monitored visits three times per week for three hours per visit.

On August 13, 2020, father failed to appear for another drug test.

The children's foster caretaker said the children had some difficulty adjusting to the placement.  She reported mother had video calls with the children and father had telephone calls.  Although father was scheduled to talk with the children three times a week for an hour each visit, he typically spoke with them for less than ten minutes per phone call.

On October 27, 2020, the juvenile court held a combined jurisdiction and disposition hearing. Father testified as a witness.

Regarding the confrontation with the paternal grandmother in June 2020, father testified his mother had "smacked" G.L. on the shoulder when she discovered the child had pressed a pillow down on E.L.'s face. Father claimed he called the family's social worker after the argument to ask if she would pick the children up from daycare, as he planned to look for new housing. He said the social worker replied she was too far away, so he made arrangements with the daycare provider to pick the children up later in the evening. He claimed he called the daycare provider later that day and was surprised to learn the social worker had already picked up the children and taken them to the maternal grandmother's home.

Contradicting his earlier admissions, father denied knowing that mother used methamphetamine when they lived together, and he claimed he would have left with the children if he had known about her substance abuse. Regarding the bottle of detox liquid, father claimed it belonged to a friend who asked him to keep it for her. He acknowledged he failed to appear for drug tests, but said he did so only because he was upset with the social worker for failing to help him.

After father's testimony, the court received argument from the parties. The Department and children's counsel joined in requesting the court sustain the counts regarding the parents' domestic violence and mother's substance abuse. The Department also urged the court to sustain the count regarding father's substance abuse. Mother and father argued the petition should be dismissed.

8

The juvenile court stated it found father's testimony was "not . . . credible" and sustained the counts regarding the parents' domestic violence, mother's substance abuse and father's failure to protect the children from its endangering effects, and father's substance abuse.

Regarding disposition, father asked for the children to be returned to his custody and objected to any order requiring him to participate in reunification services. The Department and the children's counsel joined in urging the court to remove the children from the parents' custody. The court reiterated it did not find father's testimony "truthful," and ordered the children removed from the parents' custody, with reunification services as specified in the case plan, and monitored visitation. Father's case plan consisted of a domestic violence program, parenting classes, and a full drug and alcohol treatment program.[3] The court ordered all prior orders not in conflict with the new orders to remain in "full force and effect."

## DISCUSSION

1. ***Substantial Evidence Supports the Disposition Order Removing the Children from Father's Physical Custody***

Father challenges the jurisdictional findings regarding the parents' domestic violence, his substance abuse, and his failure to protect the children from mother's substance abuse, as well as the disposition order removing the children from his physical custody. However, father acknowledges reversal of the jurisdictional findings will have no effect on his children's adjudication as dependents, which was separately based on

---

[3] The court struck an individual counseling requirement from father's case plan.

9

the sustained allegation concerning mother's substance abuse. Because jurisdiction will not be affected by our decision, and the jurisdictional findings will have no impact on father's future rights, we decline to address father's challenge to the findings. (See *In re I.A.* (2011) 201 Cal.App.4th 1484, 1491; cf. *In re Drake M.* (2012) 211 Cal.App.4th 754, 762.) In any event, the evidence set forth in our statement of the facts and the specific evidence we will discuss regarding the disposition order, amply support the jurisdictional findings. We address the disposition order now.

The purpose of the juvenile dependency laws "is to provide maximum safety and protection for children who are currently . . . being neglected, . . . and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2; see *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215.)

When a minor has been adjudged a dependent child of the court under section 300, the juvenile court may limit the control to be exercised over the dependent child by the parent or guardian. (§ 361, subd. (a).) A dependent child may not be taken from the physical custody of the parent with whom the child resides unless the juvenile court finds by clear and convincing evidence that there is a "substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected" without removal. (§ 361, subd. (c)(1); see *In re Ashly F.* (2014) 225 Cal.App.4th 803, 809–810.) " 'The court may consider a parent's past conduct as well as present circumstances.' " (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.) " 'A removal order is proper if it is based on proof of

10

(1) parental inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent.' " (*In re Francisco D.* (2014) 230 Cal.App.4th 73, 83 (*Francisco D.*).)

Our Supreme Court recently clarified the standard for appellate courts to use when reviewing findings that must be proved by clear and convincing evidence. In such cases, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B., supra,* 9 Cal.5th at pp. 995–996; see also *In re Jasmon O.* (1994) 8 Cal.4th 398, 423.) The appellant has the burden of showing there is insufficient evidence to support the juvenile court's findings or orders. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)

Father's arguments largely ignore his burden as the appellant and our standard for reviewing the juvenile court's disposition order. Father contends he was "able to protect" the children, citing his negative drug tests and his mother's statement that, for a period in May 2020, he had been "attentive to the children." His focus on these favorable shreds of evidence improperly disregards contrary evidence supporting the court's removal order.

11

Father's negative drug tests were part of a mix of evidence that included his discredited claims about his knowledge of mother's drug use; mother's and the paternal grandmother's repeated accusations related to his erratic and irresponsible behavior; his possession of a bottle of a detox liquid; his boasts to mother about knowing " 'how to work the system' "; and his several missed drug tests. The paternal grandmother reported father frequently left her home early in the morning and did not return until late at night. Mother believed father used drugs with his friends.

The evidence also showed, less than a month after father's reported episode of attentiveness, the paternal grandmother demanded he and the children leave her home because father had left her to do " 'everything,' " while doing nothing himself to care for or to provide for the children. Father responded by demanding the Department's social worker come to retrieve the children, outrageously arguing it was the social worker's " 'job to come and pick them up.' " He then took the children to daycare without arranging to have them picked up before the daycare closed, ultimately leaving it for the social worker to retrieve the children and to bring them to their maternal grandmother's house. When he testified about the incident at the disposition hearing, father told an implausible story that contradicted everyone else's account and that the trial court found was not credible. His erratic behavior was consistent with violent confrontations he had with mother and the paternal grandmother even after the family came under the juvenile court's supervision. This evidence amply supported the court's finding that returning the children to father's custody posed

a significant risk to their physical and emotional wellbeing. (See *Francisco D., supra,* 230 Cal.App.4th at p. 83.)

The same evidence supports the juvenile court's finding that there were no reasonable alternatives to removal. Father contends continued random drug testing, unannounced home visits, and wraparound services would have been adequate to support his efforts to care for and to protect the children in his custody. The contention ignores his multiple missed drug tests, his inconsistent focus on his parental responsibilities, and his deceitful conduct during the period of supervision. Substantial evidence supports the removal order.

## 2. *The Juvenile Court Reasonably Ordered Reunification Services*

"Section 362, subdivision (d) authorizes the juvenile court to 'direct any reasonable orders to the parents' of a dependent child as the court deems necessary and proper to ensure appropriate care, supervision, custody, conduct, maintenance, and support of the child." (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1071 (*D.P.*); see also § 362, subd. (a).) The order may include "a direction to participate in a counseling or education program," provided that the "program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300." (§ 362, subd. (d); *D.P.,* at p. 1071; but see *In re Briana V.* (2015) 236 Cal.App.4th 297, 311 [holding, "[t]he problem that the juvenile court seeks to address [under section 362] need not be described in the sustained section 300 petition"; "[i]n fact, there need not be a jurisdictional finding as to the particular parent upon whom the court imposes a dispositional order"]; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492

13

["'[a] jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency jurisdiction has been established"]; accord *In re D.L.* (2018) 22 Cal.App.5th 1142, 1148.)

"We review the juvenile court's disposition case plan for an abuse of discretion. 'The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly. On appeal, this determination cannot be reversed absent a clear abuse of discretion.'" (*D.P., supra,* 44 Cal.App.5th at p. 1071, quoting *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474; see also *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006 (*Christopher H.*).)

Father contends the juvenile court abused its discretion when it ordered him to participate in a drug treatment program, parenting classes, and domestic violence classes. He argues he is not a substance abuser, and even if the court had reason to believe he was using drugs, he maintains there was no evidence of a "nexus" between his drug use and risk of harm to the children. He also argues the parenting and domestic violence classes were unnecessary. He says the record proves he was "properly caring for the children," and he claims the "disputes" with mother were "no longer an issue" because they "mostly related to [her] past drug use."

Contrary to father's contentions, the record shows he regularly neglected his parental duties during the period of supervision. The Department placed the children in foster care because the paternal grandmother reported father was doing nothing to care for or to provide for the children and she could not continue to do " 'everything' " for them. During the ensuing

14

confrontation with the paternal grandmother, father demanded the social worker come to retrieve the children. He then left the children at daycare without informing the Department or arranging to have them picked up before the daycare closed. The paternal grandmother maintained father's " 'erratic' " and " 'hysterical' " behavior, including " 'yelling' " at her and the children, was due to his drug use. Given father's several missed drug tests and his deceitfulness around the issue, we cannot say the juvenile court abused its discretion by ordering him to participate in a treatment program. Father's irresponsible behavior also supported the order for parenting classes.

The evidence also showed the parents continued to engage in domestic violence. Even after the parents physically separated and mother began drug treatment, father pushed mother and bruised her arm in a confrontation that resulted in mother filing a police report against him. Given the children's tender years, and the parents' ongoing altercations, the juvenile court reasonably ordered father to complete a domestic violence class as a condition for reunification.

3. ***The Juvenile Court Reasonably Exercised Its Discretion to Impose a Monitored Visitation Restriction and the Terms of Visitation Were Specified in the Court's Prior Order***

Father contends there was insufficient evidence to support the monitored visitation restriction. We review a juvenile court's visitation order for abuse of discretion. (*In re Tanis H.* (1997) 59 Cal.App.4th 1218, 1227–1228.) In making visitation orders, the court is guided by the principle that "[v]isitation shall be as frequent as possible, consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A); *In re Nicholas B.* (2001) 88 Cal.App.4th

15

1126, 1138.)  Of equal importance, however, is the statutory directive that "[n]o visitation order shall jeopardize the safety of the child."  (§ 362.1, subd. (a)(1)(B).)  The juvenile court must balance the "interests of the parent in visitation with the best interests of the child" and "impose any other conditions or requirements to further define the right to visitation in light of the particular circumstances of the case before it." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.)

Father has not shown the monitored visitation restriction was an abuse of discretion.  He contends he "maintained positive and appropriate visits" with the children and they had a "health[y] attachment" to him.  But the evidence showed father failed to meet his parental responsibilities when the children were in his care, forcing the paternal grandmother to do " 'everything' " for the children, and he spoke to the children for only 30 minutes per week following their detention, even though he was entitled to speak with them for up to nine hours under the visitation order.  Moreover, father's erratic behavior in the week before the Department placed the children in foster care plainly supported the monitored visitation restriction.

As for father's contention that the visitation order "did not specify a minimum frequency or duration of the visits," the record refutes his argument.  At the disposition hearing, the court ordered that all prior orders not in conflict with its new order remained in "full force and effect."  Although father's case plan did not specify the frequency and duration of his monitored visits, the court had previously ordered, upon the children's detention from father's custody, that father was entitled to visitation three times per week for three hours per visit.  Unlike the cases father relies upon, the juvenile court did not improperly

16

delegate its authority to the Department or the children to set the terms of visitation. (Cf. *In re S.H.* (2003) 111 Cal.App.4th 310, 318–319 [order stating " 'if the children refuse a visit, then they shall not be forced to have a visit' " improperly delegated authority to children and granted mother only an "illusory" right to visitation]; *In re Korbin Z.* (2016) 3 Cal.App.5th 511, 516 [order to facilitate monitored visits between child and estranged father "in a therapeutic setting at [child's] discretion" improperly delegated authority to decide whether visitation would occur to child]; see also *Christopher H.*, *supra*, 50 Cal.App.4th at p. 1009 ["visitation order need not specify the frequency and length of visits"; order for " 'reasonable' " visitation does not improperly delegate authority to child welfare agency because it "must be read in light of statutory mandates prescribing visitation between parent and child 'as frequent as possible, consistent with the well-being of the minor' "].)

## DISPOSITION

The orders are affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

EGERTON, J.

We concur:

EDMON, P. J.

KALRA, J.*

---

*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18